IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PHILIP HOLZKAMPER, II                                                            PLAINTIFF

v.                         Civil No. 05-5071

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                                   DEFENDANT

# REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Philip Holzkamper, II, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act and his application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act.[1] The court has before it an appeal brief submitted by the Commissioner (Doc. 6) and the transcript of the social security proceedings. No brief was submitted by the plaintiff.

**Procedural Background:**

Holzkamper filed his application for DIB on October 11, 2002, and his application for SSI on September 26, 2002. (Tr. 16, 47-48). He alleged a disability onset date of October 15, 2001, due to back and hip problems. (Tr. 16).

---

[1]After beginning review of the record, the undersigned noted that Holzkamper's return address appeared to be in Missouri. For this reason, an order was entered on April 10, 2006, requiring the Holzkamper to file an affidavit providing the court with information regarding his residency. (Doc. 7). Under 42 U.S.C. § 405(g), a petition for review of a decision of the Commissioner must be brought in the district in which the claimant resides. By affidavit, Holzkamper asserts he moved from Missouri to Arkansas in October of 2004. This action was filed on April 22, 2005.

-1-

An administrative hearing was held on May 21, 2004. (Tr. 289-334). Holzkamper appeared and testified. (Tr. 298-333). He was represented by counsel. (Tr. 291). A vocational expert, Elizabeth Ramos-Brown was present via telephone. (Tr. 296-297). However, the vocational expert did not testify. (Tr. 333). Instead, after the hearing, written interrogatories were submitted to her. (Tr. 333).

By written decision dated November 24, 2004, the administrative law judge (ALJ) found that Holzkamper was not disabled within the meaning of the Act. (Tr. 13-22). The ALJ found that, although severe, Holzkamper's impairments did not meet or equal the criteria of any of the impairments listed in Appendix I, Subpart P, Regulations No. 4 (Tr. 17). After discrediting Holzkamper's subjective allegations, the ALJ concluded that he maintained the residual functional capacity (RFC) to engage in a full range of sedentary work. (Tr. 19).

Holzkamper appealed the decision of the ALJ. (Tr. 12). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Holtzkamper's request for review on March 31, 2005. (Tr. 5-8).

**Evidence Presented:**

At the May 21, 2004, hearing before the ALJ, Holzkamper testified he was thirty-eight years old and had graduated from high school. (Tr. 299). He was in special education classes from second grade until the twelfth grade. (Tr. 310). He took English and mathematics in mainstream classrooms. (Tr. 311).

He testified he had difficulty reading but does read papers. (Tr. 312 & 329-330). He indicated he could fill out a job application but would have problems because he can't read all the

-2-

words on the application and can't spell. (Tr. 312). Holzkamper can count change and use a calculator. (Tr. 314-315).

He indicated he last worked as a sander of hardwood floors and was required to lift the sanding machine that weighed approximately 300 pounds. (Tr. 300). He was required to bend, stoop, kneel, and crawl and spent about seven hours each day on his feet. (Tr. 300-301). Prior to that, Holzkamper indicated he had worked as a painter and did various jobs in a factory that built hot water heaters (Tr. 301-304).

When asked what prevented him from doing his work as a sander, Holzkamper replied that he couldn't bend anymore because his lower back hurts so much. (Tr. 306). Holzkamper indicated he couldn't get back up. (Tr. 306). He indicated his back always hurts. (Tr. 306).

When asked to describe the pain, Holzkamper testified that sometimes it felt like a knife being shoved in his back. (Tr. 306). He described it as a sharp pain that was constant. (Tr. 307).

The pain wakes him up at night almost every night. (Tr. 322-323). When he wakes up at night, he gets up for a few minutes, walks around, takes a pain pill, and then goes back to bed. (Tr. 323). He can sleep for about four hours without being interrupted by pain. (Tr. 323).

If he sits more than ten or fifteen minutes, the pain gets worse and he has to get up. (Tr. 307). Holzkamper also testified he can't lift more than ten or fifteen pounds anymore or crawl. (Tr. 307-308). He can probably walk half a block and then he starts hurting and has to sit down for awhile. (Tr. 328).

Holzkamper testified he takes both pain pills and muscle relaxers and they make him real tired. (Tr. 323). On a scale of one to ten, if he doesn't take his pain medication, Holzkamper

AO72A
(Rev. 8/82)

would rate his pain at a ten. (Tr. 325). Taking his medication, he rated his pain at a five the day of the hearing. (Tr. 325).

Although Holzkamper testified he had a driver's license, he indicated he did not drive anymore because it causes him pain and makes him uncomfortable sitting in the seat. (Tr. 309-310 & 314). Getting in and out of the vehicle also hurts him. (Tr. 314).

When he was thirteen, Holzkamper testified his hips were apart so plates were inserted and the plates are held in place by pins. (Tr. 319-320). He indicated he now has pain where the pins are. (Tr. 320). He stated he has hip pain about once a week. (Tr. 321).

Holzkamper testified that he injured his back in 1995 when he and another man were moving a wood stove that weighed about 1,000 pounds. (Tr. 315-316). The other man dropped his end of the stove and it pulled Holzkamper straight to the floor and his back started hurting. (Tr. 316).

Since the back injury, Holzkamper testified he just couldn't do as much. (Tr. 317). Holzkamper testified he could no longer go canoeing, he couldn't hike, and he couldn't climb. (Tr. 317). When he tries to do any of these things, he has pain in his lower back and legs. (Tr. 318). He indicated his legs get "to tingling and they go out." (Tr. 318). He stated it was like an electric charge going down him. (Tr. 318). He indicated his right hip was worse than his left. (Tr. 319).

Out of the two problems, his hips and his back, Holzkamper testified his back is worse. (Tr. 321-322). He stated he could stand in one position about ten or fifteen minutes. (Tr. 322).

AO72A
(Rev. 8/82)

Holzkamper can dress himself. (Tr. 326). He does not carry groceries, empty the garbage, or mow the yard. (Tr. 326). He testified there was nothing he did on a routine basis to keep the house up. (Tr. 326-327).

He spends his day watching television and sleeping. (Tr. 327). Holzkamper indicated he had talked to two back specialists and been told he was too young for back surgery. (Tr. 327). He underwent two months of physical therapy but didn't see any improvement. (Tr. 327). He also had steroid injection in his lower back but received no relief from them. (Tr. 327).

The medical and vocational evidence establishes that Holzkamper was seen by Dr. David Tucker of Gravette Medical Associates, Ltd., on the following occasions: October 5, 2001, pain in left hip, past pin placement for slipped femoral capital epiphysis, no pain on range of motion but pain on palpation, x-rays show screws in place, some mild collapse of the femoral head, mild degenerative joint disease (DJD) of the hip, will be evaluated for hardware removal by an orthopedist, also having some problems with gastroesophageal reflux disease (GERD) (Tr. 182); December 10, 2001, was seen by a specialist, problems with degenerative disc disease, magnetic resonance imaging (MRI) scan showed bulging of all lumbar discs and neuroforamin stenosis (Tr. 181); February 25, 2002, having problems with back pain mostly at night, given Soma to take at night time (Tr. 181); May 16, 2002, continued back problems, referral to a back specialist will be arranged, refill on Norgesic Forte given, unable to work at this time (Tr. 180); September 16, 2002, complaining of back pain from a herniated lumbar disc, given a trial of Panalor SS for pain and put on Feldene 20 mg. daily (Tr. 179); October 11, 2002, complaining of an allergic reaction to Panalor and chronic back pain, prescribed Feldene 20 mg. daily and Talwin NX on an as needed basis for pain (Tr. 178); March 12, 2003, complaining of back problems, prescribed Lorcet Plus

AO72A
(Rev. 8/82)

to take as needed for pain, continue on Zanaflex and put on Feldene (Tr. 236); July 9, 2003, diagnosed with prostatitis and muscle tension headache (Tr. 235); July 14, 2003, diagnosed with prostatitis (Tr. 234); December 17, 2003, complaining of chronic back pain and ineffective pain medication, prescribed Xanaflex, Amitriptyline, and Panalor DC for pain (Tr. 233); April 9, 2004, vasectomy (Tr. 263); May 26, 2004, for persistent back pain, an MRI was scheduled for May 30th (Tr. 262); and June 11, 2004, for tonsillitis, pharyngitis, and low back pain (Tr. 259).

On October 24, 2001, Holzkamper was seen by Dr. J. Timothy Ogden. (Tr. 193-195). Holzkamper was complaining of bilateral hip pain. (Tr. 193). He indicated he had been having the hip pain for about three months and that it was severe and ran down to his knees. (Tr. 193).

Holzkamper reported that at age thirteen he had a hip condition that required him to have three screws drilled into his femoral neck and heads in order to maintain stability. (Tr. 193). He reported no traumatic injury to his hips but did have an injury to his back five years previously when a two thousand pound wood stove fell on his back. (Tr. 193). Holzkamper reported that he crushed two vertebrae and surgery was recommended but he did not have the surgery and instead rehabilitated himself. (Tr. 193). Holzkamper reported the pain was most severe in his hips but he did have pain that originated in his lumbar area and traveled down to the back of his legs and sometimes into his calves. (Tr. 193).

On examination, Dr. Ogden noted that Holzkamper had some loss of lordosis, palpable pain at L3, 4, and 5, and palpable pain bilaterally all the way down the lower back to the hips. (Tr. 193). Holzkamper was able to fully flex forward at the lower back and extend. (Tr. 193). Holzkamper experienced pain with left and right lateral movements and the pain increased with

AO72A
(Rev. 8/82)

a twisting motion right and left. (Tr. 193). No atrophy was noted of the muscles of the legs or calves. (Tr. 194). Straight leg raise was negative. (Tr. 194).

Holzkamper had severe pain with palpation over the greater trochanter for both hips with pain in the posterior aspect of the trochanter. (Tr. 194). He also had palpable pain just distal to both trochanters along the incision about where his screws were in his hip. (Tr. 194). Active range of motion in his hip was normal but with any type of internal rotation the pain increased along the posterior aspect of the trochanters of both hips. (Tr. 194). Passive range of motion was the same. (Tr. 194).

The diagnosis was lower lumbar radiculopathy and trochanteric bursitis of both hips. (Tr. 194). It was believed that Holzkamper's problems were due to his back. (Tr. 194). Surgery to remove the screws was not recommended as it was believed that Holzkamper would still have a lot of radiculopathy from his lumbar. (Tr. 194). For the bursitis symptoms it was recommended that Holzkamper have an injection of steroids to decrease the inflammation. (Tr. 194). He was given an injection that day. (Tr. 195). It was recommended that a neurological consult be arranged. (Tr. 195).

On November 7, 2001, Dr. Ogden ordered a lumbar MRI done on Holzkamper. (Tr. 184). The MRI revealed:

> 1. Ventral right lateral extradural defect at L5-S1. A focal protruding disc versus disc herniation could have this appearance. There is evidence of slight posterior displacement and effacement of the adjacent right nerve root. The clinical significance of this finding is uncertain. Correlation is suggested.
>
> 2. Broad-based bulging of the L4-L5 disc as well as evidence of facet joint arthropathy causing marginal bilateral neural foraminal encroachment at this level. A lumbar mylegram may be helpful in further determining whether or not this represents a clinically significant lesion.

-7-

      3. Degenerative disc space narrowing with early degenerative disc disease at L2-L3 and L4-L5.

      4. Bulging of virtually all lumbar discs.

(Tr. 184-185). X-rays showed anterior osteophytic spurring throughout the lumbar spine. (Tr. 189). It was also noted that Holzkamper had early degenerative disc disease at L2-L3. (Tr. 189). There was no evidence of acute osseous abnormality. (Tr. 189). After the MRI was done, Dr. Ogden explained again to Holzkamper that the hip and leg pain he was feeling was coming from his lower lumbar due to degenerative joint disease and herniated disc. (Tr. 195).

      On January 21, 2002, a physical residual functional capacity assessment was completed by Dr. Vincent Previti, a medical consultant. (Tr. 205-212). With respect to exertional limitations, it stated Holzkamper could occasionally lift or carry ten pounds; could frequently lift or carry less than ten pounds; could stand and/or walk at least two hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was unlimited other than as shown for lift and/or carry. (Tr. 206). With respect to postural limitations, it was noted Holzkamper should only occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 207). No manipulative, visual, or communicative limitations were established. (Tr. 208-209). With respect to environmental limitations, it was noted Holzkamper should avoid even moderate exposure to vibration and avoid concentrated exposure to hazards such as machinery, heights, etc. (Tr. 209).

      On December 16, 2002, an MRI of Holzkamper's lumbar spine was done. (Tr. 201). The MRI was compared to the one done on November 7, 2001. (Tr. 201). It was noted that the MRI was unchanged. (Tr. 201). Holzkamper was seen by Dr. Thomas B. Briggs, a neurologist, on December 16, 2002. (Tr. 202-204). Holzkamper was noted to have diminished range of motion

AO72A
(Rev. 8/82)

of his back with stiffness and soreness at the lumbosacral junction. (Tr. 203). The lumbar back was without tenderness to percussion or palpation. (Tr. 203). He had full active and passive range of motion of the upper and lower extremities. (Tr. 203). The straight leg raise was negative bilaterally. (Tr. 203). Dr. Briggs diagnostic impression was low back pain secondary to multiple-level disc disease and chronic and recurring low back pain. (Tr. 204).

On January 5, 2004, Dr. Tucker wrote that Holzkamper had chronic lumbar disc disease and was unable to "do any type of even mild to moderate activities that involve his back." (Tr. 217). He also wrote that Holzkamper was prone to have pain from the degenerative disc disease and degenerative joint disease of the lumbar spine and the pain would be exacerbated by long periods of immobility and sitting in one place for a prolonged period of time. (Tr. 288).

On April 14, 2004, Dr. Tucker completed a medical source statement of ability to do work-related activities (physical). (Tr. 224-227). He indicated Holzkamper could occasionally lift or carry twenty pounds and frequently lift or carry twenty pounds. (Tr. 224). Holzkamper could stand and/or walk less than two hours in an eight hour workday and must periodically alternate sitting and standing to relieve pain or discomfort. (Tr. 225). Holzkamper could only occasionally climb and should never balance, kneel, crouch, crawl, or stoop. (Tr. 225). Holzkamper was also limited to only occasional reaching. (Tr. 226). No environmental limitations were listed. (Tr. 227).

On May 30, 2004, an MRI of Holzkamper's lumbar spine was done. (Tr. 260). It showed a focal left-sided disc protrusion at the L4-5 level which resulted in displacement of the L4 nerve root. (Tr. 260). Facet arthritis was also demonstrated at the L4-5 level. (Tr. 260). It also showed right focal disc protrusion with nerve root displacement at L5-S1 on the right. (Tr. 260-261).

On June 21, 2004, a lumbar myelogram was done. (Tr. 160-161). It revealed degenerative changes at all lumbar levels but particularly at L2-3 and L3-4. (Tr. 160). No acute lumbar vertebral collapse or spondylolisthesis was evident. (Tr. 160). Mild diffuse disc bulging at the L2-3, L3-4, L4-5, and L5-S1 level was evident. (Tr. 160). There was also mild bilateral L4 nerve root sleeve compression at the L3-4 level. (Tr. 160).

Holzkamper also had a lumbar CT scan done. (Tr. 174-175). The CT scan revealed:

1. Mild spinal and foraminal stenosis at L2-3 due to degenerative changes.

2. Mild spinal and foraminal stenosis at L3-4 due to degenerative changes.

3. Mild to moderate spinal stenosis at L4-5 due to degenerative changes. Note in addition that there is left lateral recess stenosis and asymmetric left foraminal stenosis due to a left paracentral and foraminal disc protrusion.

4. Small right paracentral disc protrusion and inferior extrusion at L5-S1 which produces mild displacement or effacement of the right S1 nerve root sleeve. There is also mild foraminal stenosis at L5-S1, left greater than right, due to disc bulging and facet hypertrophy.

(Tr. 174).

On July 23, 2004, Dr. Harvey L. Alpern, a medical expert, responded to written interrogatories propounded by the Administration. (Tr. 122-129). Dr. Alpern indicated Holzkamper had the following physical impairments: degenerative disc disease; chronic low back pain; and old hip pinning. (Tr. 123). In Dr. Alpern's opinion Holzkamper's hip problem was not severe. (Tr. 124). He also noted that records of Holzkamper suffering from low back pain went back to October of 2001. (Tr. 124).

Dr. Alpern noted that the MRI of December 16, 2002, was unchanged from the prior years which showed a small bulge in the lumbar spine. (Tr. 124). Dr. Alpern concluded this would not

-10-

be at a severe level. (Tr. 124). Dr. Alpern noted that the neurologist felt there was no neurologic compromise by the abnormalities of the MRI. (Tr. 124).

Dr. Alpern concluded Holzkamper could stand two hours in an eight hour day, walk two hours in an eight hour day, and sit six hours in an eight hour day. (Tr. 126). Dr. Alpern indicated Holzkamper needed to be able to alternate sitting and standing. (Tr. 126). Dr. Alpern indicated Holzkamper was limited to lifting/carrying twenty pounds occasionally and ten pounds frequently and pushing/pulling twenty pounds occasionally and ten pounds frequently. (Tr. 126). Dr. Alpern also stated Holzkamper was limited to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 126).

On September 8, 2004, a vocational expert, Elizabeth G. Brown-Ramos, responded to a written interrogatories propounded by the ALJ. (Tr. 139-149). Brown-Ramos was asked a series of hypothetical questions. In the first, she was asked to assume a claimant in possession of the claimant's profile who was the same age, education, and ability to communicate in the English language who had the following restrictions: the person could occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand and walk up to two hours, cumulatively, in an eight hour day; sit six hours, cumulatively, in an eight hour day; and who could from time to time, or at least occasionally, bend, stoop, kneel, crouch, crawl, and climb. (Tr. 143).

Brown-Ramos indicated that such a person could perform at the sedentary exertional level. (Tr. 148). She stated that the hypothetical person could not perform any of the claimant's past relevant work. (Tr. 148). She stated that the work as an order clerk, table worker/spotter, and lamp shade assembler would fall within that hypothetical. (Tr. 148).

-11-

Brown-Ramos was then asked to change the hypothetical to assume a claimant who possesses the same capabilities and limitations as described by the claimant in his testimony. (Tr. 145). Brown-Ramos noted that Holzkamper testified he could only sit for ten minutes at a time due to pain in his hips and back. (Tr. 148). With this limitation, Brown-Ramos indicated the person would not have the ability to perform sedentary work on a sustained basis. (Tr. 149).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A),

1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

As the claimant did not file a brief, he has not advanced any specific arguments suggesting how he believes the ALJ erred. We first turn to the ALJ's evaluation of Holzkamper's subjective complaints. In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb

AO72A
(Rev. 8/82)

the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

In this case, we believe the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) and conclude there is substantial evidence supporting the ALJ's determination that Holzkamper's complaints were not fully credible. The ALJ properly considered Holzkamper's testimony regarding the condition of his back and hips and his daily activities. While the ALJ believed Holzkamper did experience some pain, the ALJ concluded that the pain was not of the degree or extent that Holzkamper asserted. The ALJ in so concluding carefully pointed out inconsistencies between Holzkamper's testimony, the medical records, and the conservative course of treatment he was receiving from his family physician. The "ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); *Black v. Apfel*, 143 F.3d 383, 388 (8th Cir. 1998)(upholding denial of benefits where no objective medical evidence supported claimant's subjective pain complaints).

Next, we turn to the ALJ's use of the vocational expert. We find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, we find that the vocational expert's responses to written interrogatories constitutes substantial evidence supporting the ALJ's conclusion that there were jobs in national economy that the claimant could perform. *See Pickney*, 96 F.3d at 296 (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

With respect to the use of post-hearing written interrogatories, we note that the use of such interrogatories does not violate due process so long as the claimant is given the opportunity to object to the interrogatories, propose his own interrogatories, comment on the evidence, and to submit additional evidence. *Coffin v. Sullivan*, 895 F.2d 1206, 1212 (8th Cir. 1990). In this case, the ALJ advised the claimant and his attorney at the hearing held in May of 2004 that written interrogatories would be propounded to the vocational expert. (Tr. 333-334). No objection was made at the time to this procedure. (Tr. 333-334).

On September 2, 2004, the written interrogatories were sent to the vocational expert with copies to the claimant and his counsel. (Tr. 138).[2] The letter that went to claimant and his counsel stated that claimant could object to any of the interrogatories, propose other interrogatories, or object to the ALJ's obtaining information. (Tr. 138). If the claimant had any objections to the procedure, he was directed to respond within ten days. (Tr. 138). On October 18, 2004, more than ten days later, claimant's attorney sent a letter to the ALJ in which she stated she had received the interrogatories submitted by Elizabeth Brown-Ramos and would "appreciate an[] opportunity to cross examine the medical expert with regard to hypothetical 1 and the listing of jobs selected from the DOT." (Tr. 158). The letter also referred to the medical expert and enclosed a response to the medical expert's opinion. (Tr. 158). This issue appears not to have been addressed again by the claimant's attorney or the ALJ. Nothing in the record suggests the issue was raised at the Appeals Council. Claimant waived this issue by not objecting to the use of the interrogatories in a timely manner and not raising the issue before the Appeals Council. We next turn to the ALJ's

---

[2] The letter actually went to both claimant's original counsel Daniel Parmele and his counsel at the time the hearing was held, Mima Cazort. A copy also went to the claimant.

-15-

determination that Holzkamper had the RFC to engage in a full range of sedentary work. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id*.

In the present case, the ALJ carefully reviewed the medical records, plaintiff's subjective complaints, the plaintiff's testimony regarding his daily activities, and the functional limitations set forth by the non-examining physicians. As noted above, the ALJ carefully explained his reasons for discounting Holzkamper's testimony regarding the disabling nature of his physical limitations and associated pain. The ALJ also carefully reviewed both the treating physician's and the non-examining physician's assessment of Holzkamper's physical ability and limitations as well as reviewing all available medical evidence. The medical evidence does not support a finding of greater functional limitations than those found to exist by the ALJ. In fact, the medical findings do not support any restrictions on Holzkamper that would be inconsistent with this RFC.

We conclude that the administrative record supports the ALJ's finding that Holzkamper is physically capable of doing sedentary work. Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). The physical capacity form completed by Dr. Tucker, Holzkamper's treating physician, and the answers to written interrogatories submitted by the medical expert, Dr. Alpern, agree that Holzkamper is capable of meeting the physical exertional requirements of sedentary work.

**Conclusion**:

For the reasons stated, I recommend that the decision of the Commissioner denying benefits to the plaintiff be affirmed. **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 24th day of April 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)